(No. 55570.—

SANDRA DARLENE HOFMANN, Appellant, v. ROGER WILLIAM HOFMANN *et al.,* Appellees.

*Opinion filed February 18, 1983.*

208

RYAN, C.J., concurring in part and dissenting in part.

Franklin S. Wallace, of Winstein, Kavensky, Wallace & Doughty, of Rock Island, for appellant.

Peter H. Lousberg, of Lousberg & McLean, of Rock Island, for appellee Roger William Hofmann.

Stuart R. Lefstein and Samuel S. McHard, of Katz, McAndrews, Durkee, Balch & Lefstein, of Rock Island, for appellees William H. and Donna Hofmann.

JUSTICE SIMON delivered the opinion of the court:

What disposition should be made of property in connection with a dissolution of the marriage of Sandra and Roger Hofmann, and in particular the disposition of a 319-acre farm known as the "Sackville farm," of which Sandra claims she was deprived by collusion between her husband and his parents, and a 77½-acre farm known as the "McManus farm" are the questions involved in this

appeal. Sandra and Roger maintained their marital residence on the Sackville farm, and Roger, a full-time farmer, farmed both farms.

Sandra and Roger were married on March 17, 1972. The Sackville farm was owned by Roger's parents at that time, and Roger leased it and farmed it on a 50% share-crop basis. Prior to the marriage, in 1969, Roger entered into a contract for deed for the purchase of the McManus farm. The total price of this farm was $50,375. Roger received $10,000 from his parents, which he used as a down payment on the farm, and after the marriage Roger and Sandra continued to make payments on it until the petition for dissolution was filed on November 4, 1977, at which time $13,575 remained owing on that farm. In his financial statements, Roger placed a value on the McManus farm of $155,000 on December 5, 1977, and of $232,000 on March 28, 1979.

The Sackville farm was purchased by Roger's parents in 1971 and leased to Roger in that year. The lease arrangement continued until April 15, 1976, when Roger entered into a contract with his parents for the installment purchase of the farm. The contract required a down payment of $20,000, which Roger borrowed from a local bank, and annual installment payments of between $10,000 and $25,000, at 6% interest, were due on March 20 of each year. Title was to pass to Roger only upon payment of the full price of $239,250. The contract contained a clause permitting the parents to declare a full forfeiture if any of the conditions of the contract were breached.

On March 20, 1977, Roger paid $13,000 of the yearly payment due on the Sackville farm and gave his parents a promissory note for an additional $5,000 which they claimed was due in that month, but which they agreed to allow him to pay in cash in December 1977. During the year, however, Roger was confronted with several debts

in addition to the payment that was due on the Sackville farm. He paid off a debt of $11,720.33 on October 11, 1977, for a farm bin which he had purchased for the Sackville farm, and on October 26, 1977, he made a $13,752.55 payment on a combine which he later testified he would not have needed had it not been for the size of the Sackville farm. In November and December 1977, Roger made two more payments of approximately $3,000 each relating to the various properties he was farming. On the appointed date in late December, however, he did not have the $5,000 he needed for payment to his parents on the Sackville farm, and he claimed he could not meet that obligation even after his parents gave him an extension of 30 days in which to do so. On January 21, 1978, they served a notice of intention to declare a forfeiture of the contract for deed and a notice of intention to file a forcible detainer suit as to the property. Roger did not contest the forfeiture, despite the fact that he had an equity of approximately $420,000 in the farm at the time due to appreciation, and no forcible detainer suit was filed. The Sackville property was declared forfeited on February 23, 1978, along with all down payments and improvements made on it. Roger continued to live on the farm as a sharecropper, however, and later leased the farm for a yearly cash rent of $25,000, as he continues to do.

Sandra and Roger had experienced marital difficulties since 1972, the year of their marriage, and separated in 1973, reuniting later in that year. They had one child, and Sandra worked as a dentist's aide and a beautician and helped Roger on the farm to help support the family. Differences continued between them, however, and when the contract for sale of the Sackville farm was negotiated between Roger and his parents in 1976 a lawyer explained to Sandra, who was present, that her name was intentionally omitted from the contract as a buyer and

that the purpose of this was to preclude her from getting an interest in the farm in the event of divorce.

Sandra filed for divorce on November 4, 1977, a month and a half before the $5,000 payment on the Sackville farm was due and three and a half months before the farm was forfeited. She claimed certain items as marital property, including the Sackville and McManus farms, and sought an award of attorney fees. Roger's parents, as title owners of the Sackville farm, were added as parties defendant in June 1978. The circuit court of Mercer County denied attorney fees but ruled that certain corn, farm machinery and land in Arizona were marital property, 30% of which was to belong to Sandra. It ruled that the McManus farm was not marital property but belonged to Roger. With regard to the Sackville farm, it ruled:

> "No matter how Roger and his parents describe the transaction, this Court has only one conclusion: The parents' attempted foreclosure and Roger's acquiescence in failing to make the $5000 payment while paying other obligations was simply an attempt to wipe out an equity and prevent Sandra from sharing marital property.
>
> In a sporting event this would be called a 'fix.' To allow games to be played with marital property would be unconscionable."

The court accordingly awarded Sandra a 30% share of the Sackville farm as a lien against the title.

On appeal, the appellate court, with one judge dissenting, reversed the circuit court order as to the Sackville farm, holding that since neither spouse had an interest in it at the time of dissolution it could not be treated as marital property. (99 Ill. App. 3d 526.) The court did not reach other issues, even though they were briefed. On this appeal Sandra seeks to reinstate the circuit court's order concerning the Sackville farm, to overturn that court's determination that the McManus farm was nonmarital property and

its denial of attorney fees, and to increase the amount of the award of marital property from 30% to 50%. Roger, on cross-appeal, disputes the trial court's computation of his equity in the crops which were determined to be marital property, an issue which the appellate court did not address, and also seeks to have Sandra's award of 30% of the marital property declared excessive. We will treat each of the issues in turn.

### THE SACKVILLE FARM

The appellate court, in ruling that the Sackville farm was not marital property at the time of dissolution, based its holding on the theory that property held by a spouse becomes "marital property" only upon entry of an order of dissolution and can be alienated free from any claim by the other spouse until that time. It assumed that the farm would have been marital property had it remained in Roger's possession and therefore did not rule on that issue. Roger and his parents maintained before the circuit and appellate courts, as they continue to do as appellees here, that the farm was essentially a gift to Roger under the installment sale contract and thus comes under an exception to the statute creating marital property rights. They also argue that Sandra expressly agreed to the provision of the sale contract precluding her from acquiring an interest in the farm, and thus attempt to invoke another exception to the marital-property statute for property excluded from its reach pursuant to a valid agreement between spouses.

The statute governing marital property in Illinois is section 503 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 503), which provides in relevant part:

"(a) For purposes of this Act, 'marital property' means all property acquired by either spouse subsequent to the marriage, except the following, which is known as 'non-marital property':

(1) property acquired by gift, \* \* \*; [or]

\* \* \*

(4) property excluded by valid agreement of the parties."

The statute creates a rebuttable presumption that all property acquired after marriage is marital property. See *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 571, citing Ill. Rev. Stat. 1977, ch. 40, par. 503(b).

Roger and his parents base their assertion that the contract for sale of the Sackville farm was a gift on the fact that the property was valued at considerably more than the contract sale price in 1977 and on statements made by Roger and his father in court to the effect that, although the father was aware that Roger was a poor businessman, he had earlier sold a farm to a daughter for a bargain price and wished to treat Roger similarly. The circuit court noted that although the parents may have sold the farm to Roger reluctantly, they sold it for a higher price than they had paid for it five years earlier and ruled that the property was not even partially a gift, citing testimony by Roger's mother that she considered the sale price to be a "fair" one. We note the additional possibility, not disproved by the record, that the price was considered "fair" as an arm's length transaction only because Roger, with his history of insolvency, could not realistically be expected to pay a higher price. The burden of proof rests on those seeking to establish that the transaction was intended as a gift. (*In re Marriage of Severns* (1981), 93 Ill. App. 3d 122.) The trial court's determination was supported by credible evidence, and we are not free to disturb it in light of the statutory presumption.

Roger and his parents point out that the sale contract excluded Sandra from acquiring an interest in the Sackville farm, that Sandra was present during the negotiations and did not object to her exclusion when this was explained to her by the attorney, and that Sandra testified that when Roger informed her that he was going to lose the farm to

his parents she replied, "What you and your father do is your business." They argue on the basis of this evidence that there was a "valid agreement" between Roger and Sandra that she should not share in the property, and that this requires us to apply exception (4) to the marital property section (Ill. Rev. Stat. 1977, ch. 40, par. 503(a)(4)) and hold that the Sackville farm was nonmarital property. We do not agree. Sandra's testimony reveals that Roger had not arranged for her to come to the lawyer's office to listen to the negotiation of the contract but that Sandra had suggested that she accompany him, apparently on the spur of the moment, and that Roger had warned her to "shape up" just before they went. She did not bring a lawyer of her own. In the attorney's office she sat in the back of the room and did not participate in the negotiations; she heard only part of the conversation between Roger, his father and the attorney, and was informed at one point by the attorney that she was not to share in the farm in case a divorce should occur. Under these circumstances, her failure to object and her subsequent actions might be attributed to a conclusion that the lawyer was telling her that she had no legal right to share in the property or to a desire not to anger Roger or his parents, rather than to a knowing and voluntary relinquishment of rights she knew she had. She signed no formal contract, nor did she say anything in the attorney's office to indicate a voluntary surrender of known rights. This case is unlike *In re Marriage of Redden* (1980), 89 Ill. App. 3d 1073, in which the husband's intent to divest himself of his marital interest in certain property was specifically set forth in an agreement transferring the land to his wife. We believe that the trial court's finding that the Sackville farm was marital property was well founded; from our standpoint it would be sheer speculation to conclude that there was ever a "valid agreement" by Sandra to give up a marital right.

Roger points out in his brief that the property appreci-

ated greatly in value between 1976 and 1978, the years during which he was under contract to buy it, and argues that *In re Marriage of Komnick* (1981), 84 Ill. 2d 89, requires this inflationary increase to be considered as nonmarital property. The simple answer is that *In re Marriage of Komnick* held that inflation would not transform *nonmarital* assets into marital assets merely because it occurred during the marriage. In this case the trial court found, and we agree, that the Sackville farm was *marital* property from the beginning. Just as inflation cannot create marital property where none existed before, neither can it spontaneously generate nonmarital property from property which was marital when acquired.

Roger finally argues that the presumption of marital property should not apply where the property was not acquired with the help of the spouse, as manifested either directly through financial contributions or independent earnings or indirectly through domestic help. He bases this argument on the following language in *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 576:

> "[B]y giving both spouses an interest in 'marital property' upon dissolution of marriage, the legislature sought to award economic credit in the distribution of property for indirect or domestic contributions to the accumulation of property and sought to replace the concept of post-marital support through alimony with one of post-marital stability through a just distribution of marital property and assets."

We believe, however, that even if this statement were not immediately preceded in *Kujawinski* by the qualifying words "[f]or instance" and accurately defined the outer limits of the statutory concept of marital property, as Roger seems to argue, the presumption of marital property would still apply in this case. Sandra's uncontradicted testimony was that she worked to support the family during 1976 and 1977, the years during which Roger owed and attempted to make payments on the Sackville farm. Al-

though Roger borrowed the $20,000 for the down payment from a bank, it is unrealistic to assume that Sandra's labors did not account in some part for Roger's ability to make the payments he made in 1977, or for the bank's willingness to make a $20,000 loan to a businessman whose reputation for solvency could only be described as questionable. (See *In re Marriage of Lee* (1981), 87 Ill. 2d 64, 66; *In re Marriage of Smith* (1981), 86 Ill. 2d 518, 531-33.) We therefore conclude that the trial court properly treated the Sackville farm as marital property during the time Roger had an equity in it.

Roger and his parents next argue that the evidence does not conclusively establish fraud in the forfeiture of the Sackville contract, and that, even assuming that Roger's acts were attributable to a desire to deprive Sandra of marital property, there can be no cause of action for an attempt to defeat a spouse's marital rights in property in Illinois prior to a decree of dissolution. We consider the latter argument first.

The commissioners' note to section 503 of the Illinois Marriage and Dissolution of Marriage Act states that "[s]ubsection (b) [of the Act] defines marital property only for the purposes of division on dissolution of marriage or legal separation. No attempt is made to regulate the respective interests of the spouses in property during the existence of the marriage." (Ill. Rev. Stat. 1977, ch. 40, par. 503, Commissioners' Note, at 475 (Smith-Hurd 1980).) This court in *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 573, a case which did not involve an allegation of fraud, declared that the Act "does not purport to affect property interests during the marriage. The term 'marital property' is a nomenclature devised to realize an equitable distribution of property upon termination of the marriage. Operation of the term 'marital property' under the Act is not triggered until the time of dissolution. Section 503(b) does not prevent married persons from owning property sepa-

rately during the marriage and disposing of it in any fashion that the property-owning spouse may choose. [Citations.]" Commentators in the wake of *Kujawinski* have been of the opinion that a taxable event occurs when property is apportioned on dissolution of a marriage in Illinois, a result that does not obtain in States in which property acquired during marriage is deemed to be held in common ownership. (See J. DuCanto, *Federal Tax Treatment of Transfers of "Marital Property" Under the New Illinois Marriage and Dissolution of Marriage Act,* 59 Chi. B. Rec. 286 (1978).) From this, Roger and his parents reason that Roger was free to do as he pleased with his property prior to the decree of dissolution, subject at most to the *caveat* that he not engage in "fraud as manifested by the absence of donative intent to make a conveyance of a present interest in the property conveyed" (*Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 351; see *Lesnik v. Estate of Lesnik* (1980), 82 Ill. App. 3d 1102, 1105; *Payne v. River Forest State Bank & Trust Co.* (1980), 81 Ill. App. 3d 1128, 1131), which Roger and his parents suggest cannot be found in this case because the forfeiture was an involuntary transfer in which donative intent could of necessity play no part. They urge that to permit Sandra any more control over Roger's disposition of his assets prior to a decree of dissolution would be tantamount to adopting a community property system of marital rights, a step which our legislature stopped short of taking when it adopted section 503 of the Marriage and Dissolution of Marriage Act.

We believe that this view of the law is too grudging an interpretation of the intention of the Act and the cases decided under it. The *Johnson, Lesnik* and *Payne* decisions clearly recognize that fraud against marital property is not to be condoned even though it occurs before dissolution; the question in those cases involved the characterization to be given an *inter vivos* transfer by one spouse of funds to

a trust. "Fraud" in such a context is properly assessed by referring to the donative intent of the settlor. (See *Holmes v. Mims* (1953), 1 Ill. 2d 274; *Toman v. Svoboda* (1976), 39 Ill. App. 3d 394; Annot., 49 A.L.R.2d 521 (1956).) By contrast, "fraud" cannot logically be assessed in cases such as this, which involve no voluntary transfer, by inquiring into the donative intent of the transferor. In the context of a forfeiture of lands which Roger and his parents claim was involuntary, we believe that "fraud" can be measured by determining whether the forfeiture was essentially collusive in nature or only partial where it purported to be total, as opposed to a complete forfeiture in which the forfeiting party gives up his interest in the property in an arm's length transaction as a result of economic necessity or a reasonable or understandable business decision. (See *Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 359 (discussing illusory transfers); *Draper v. Draper* (1873), 68 Ill. 17 (voiding a transfer of property justified as payment of a debt on a showing that the sale in fact overpaid the debt by $6,000); *Klingberg v. Klingberg* (1979), 68 Ill. App. 3d 513 (holding a husband's withdrawal of funds from a bank account to pay former wife for child support to be fraud against second wife's marital property on a showing that the child-support payment was excessive and that husband left his second wife shortly thereafter); *Harley v. Harley* (1934), 255 Ky. 370, 74 S.W.2d 195 (voiding a transfer of property to a son for no consideration shortly before divorce, it appearing significant to the court that the son was capable of reconveying the property).) This rule accords with the statutory requirement that a transfer of property can be voided in Illinois only on a showing of an *intent to defraud* (Ill. Rev. Stat. 1977, ch. 110½, par. 601), and it prevents spouses from intentionally shielding all of their property from distribution in case of divorce by simply arranging for its forfeiture before dissolution occurs.

We do not consider such a rule to be in derogation of

the terms of the Illinois Marriage and Dissolution of Marriage Act or to be tantamount to adoption of community property law contrary to the intention of that act. Section 503 of the Act was enacted in 1977 with a remedial purpose in mind—to remedy the inequities of the common law "title" doctrine, which took an inflexible approach to real property distribution depending on which spouse held title to the property and subject only to narrowly defined "special equities" in the other spouse. Section 503 replaced the "title" approach with a common-enterprise theory of marriage and a broad grant to trial courts of discretion to reach a just distribution of assets accumulated during the marriage. (Ill. Rev. Stat. 1977, ch. 40, par. 503, Historical and Practice Notes, at 455-58 (Smith-Hurd 1977); *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 576.) The purpose of the Act was to expand the panoply of equitable remedies available to the courts, not to contract it. "Fraud" in various forms against property potentially distributable to the wife was remediable in Illinois before the enactment of section 503, even though it occurred before a decree of dissolution was entered (see, *e.g., Draper v. Draper* (1873), 68 Ill. 17); it would be anomalous to hold that section 503 was intended to change that.

We must therefore determine whether Roger's forfeiture was in fact a fraud on his wife's marital property, as measured by whether it was intended collusively with intent to regain the property or as the result of understandable business decision making. The trial court found that it was the former. As fraud will not be presumed in this State and must be proved by clear and convincing evidence (*Ray v. Winter* (1977), 67 Ill. 2d 296), we can uphold this finding only if we conclude that the trial court arrived at that conclusion by evidence of this sort. We note in this regard, however, that the fact that the forfeiture was in effect a transfer from a son to his parents calls for stricter scrutiny of it than is normally accorded to a conveyance.

See generally 37 C.J.S. *Fraudulent Conveyances* secs. 96, 251 (1943).

Sandra's argument is that because Roger had a $420,000 equity in the Sackville farm and paid other debts on less expensive farm equipment in 1977 while sacrificing the farm, his actions were not those of a rational or responsible businessman and could only be explained by an intent to defraud. She points out that while it would have taken only $5,000 to salvage his equity in the farm, he chose instead to pay $31,000 on farm equipment which was valueless without the farm. Roger and his parents attempt to justify his conduct by pointing out that acreage the size of the Sackville farm could not be farmed economically without using a combine, one of the pieces of equipment on which he made payment in 1977, and that he could have made future payments on the Sackville farm contract only by having the income from a crop which he could not plant or harvest without such equipment. They claim that the sharecrop and lease arrangements into which Roger entered after the forfeiture allowed him to continue to make an income from farming. They also suggest that it was financially wise of Roger to default on a contract with his parents rather than on a loan from someone else when faced with a shortage of funds, as this course would be less harmful to his reputation in the community for solvency.

We must reject these contentions on this record. Roger and his parents testified on several occasions that rental land was impossible to find in the vicinity of the Sackville farm, while the value of the farm itself appreciated rapidly during the time Roger had an equity in it. There is nothing in the record to indicate that Roger knew the terms on which he would be sharecropping or renting the farm back at the time of forfeiture, and the unavailability of rental land placed him more or less at the mercy of his parents, given his desire to continue farming. As it turned out, the rental cost of the land to him in 1979 was $25,000 per year

paid to his parents, more than he would ordinarily have been paying to them on the installment sale contract. The farm bins which he installed on the Sackville property, and on which he paid $14,998.83 in 1977, might have been lost with the farm, and the combine on which he paid $13,752.55 in 1977 would have been worth less without the Sackville acreage. It did not make sense to spend money on these things rather than on the farm unless he was assured that no matter what happened he would be operating the farm.

We are not impressed by Roger's theory that his creditworthiness might be improved by his defaulting to his parents rather than to an "outsider." Surely the bank which lent him the $20,000 for the down payment expected some return on its investment and would eventually learn about the forfeiture. Without an immediate assurance of land to farm, Roger might have had to inform it the hard way.

We have trouble understanding why Roger allowed the Sackville farm to be forfeited without concluding that he was assured by his parents that he would get the land back from them after the dissolution at the same or similar terms as those he enjoyed before the forfeiture, free of any claims Sandra may have had. Although we cannot point to any specific agreement between Roger and his parents, that was not an obstacle to finding fraud in *Draper v. Draper* (1873), 68 Ill. 17. We note that the transferor and transferee were father and son and observe, as the Supreme Court of Kentucky did under similar circumstances in *Harley v. Harley* (1934), 255 Ky. 370, 74 S.W.2d 195, that the transferee was capable of reconveying the property after dissolution on the same terms. (See 37 C.J.S. *Fraudulent Conveyances* secs. 79, 96 (1943).) Here this could have been done by inheritance, if not sooner. We finally observe that Roger continues to live on and farm the property, enjoying all of the revenues therefrom subject to

a yearly rental fee payable to his parents. The trial court could reasonably have found, by clear and convincing evidence, that, in permitting his parents to extinguish his ownership interest, Roger's intent was to defraud his wife of her inchoate marital interest in the farm rather than to promote his financial interest straightforwardly in an arm's length transaction.

Roger's parents contend that inasmuch as any fraud found in this case was attributable to Roger and not to them, the trial court erred in assigning Sandra a lien against their title to the Sackville farm. The general rule is that a transferee is chargeable with acquiescence in a fraudulently intended transfer where he is in possession of facts and circumstances which are not reconcilable with ordinary business integrity or would otherwise put a prudent person on inquiry. (37 C.J.S. *Fraudulent Conveyances* sec. 127 (1943); see *Renn v. Renn* (1944), 207 Ark. 147, 179 S.W.2d 657.) The evidence shows that the parents knew there were marital difficulties between Roger and Sandra in 1976 when the contract for the sale of the farm, including the forfeiture provision, was prepared. The parents had in fact participated in negotiating a provision in that contract which was designed to protect their interest and Roger's in case of a dissolution of marriage. While the parents granted Roger a brief extension of the time for payment in December 1977, they were all too ready to foreclose in February 1978 and in fact did so one day *before* expiration of the period they had given Roger to cure his breach. We believe that Roger's fraudulent intent in forfeiting his interest in the farm shortly after his wife filed for divorce was fairly chargeable to the parents, by acquiescence if not by design. See *Renn v. Renn* (1944), 207 Ark. 147, 179 S.W.2d 657.

The appellate court decision regarding the Sackville farm is reversed, and the circuit court's treatment of that farm as marital property is affirmed subject to current val-

uation of the farm to take account of possible diminution in its value as a result of the general decrease in farm prices since the circuit court ruled.

## THE McMANUS FARM

Sandra urges reversal of the circuit court's ruling that the Hofmanns' equity in the McManus farm was Roger's separate property. Her theory is that in making this ruling the circuit court failed to anticipate recent changes in the law concerning commingling of marital and nonmarital property and ruled on the erroneous assumption that the fact that Roger entered into the contract for purchase of the farm before the marriage controlled its designation.

We agree with Sandra's contention. The trial court explicitly found that principal payments of $18,300 and interest payments of $8,793 were made on the McManus contract during the marriage but "elect[ed]" to treat the property as nonmarital. We note that Sandra worked to support the family throughout her marriage, and that in fact she worked for some time on the McManus farm itself, operating the tractor on at least one occasion and working in the fields on others. Roger testified at one point that she kept the farm books as well.

In 1981, while this case was pending in this court, we decided *In re Marriage of Smith* (1981), 86 Ill. 2d 518, in which we held that "where a spouse who holds nonmarital property causes it to be commingled with marital property, *** the commingled property is presumed to be marital property." (86 Ill. 2d 518, 529.) "[T]he failure of a nonmarital property holder to segregate that property will give rise to the rebuttable presumption that the nonmarital property has been transmuted [into marital property], regardless of the status of title." (86 Ill. 2d 518, 531-32.) This was the first case in Illinois to deal with the commingling of marital and nonmarital property under section 503 of the Illinois Marriage and Dissolution of Marriage Act. While we be-

lieve that Sandra's contributions of labor and earnings were enough to raise the presumption of marital property, we note again that the trial court did not have our decisions in *Smith* and *In re Marriage of Lee* (1981), 87 Ill. 2d 64, for guidance in 1980 when it rendered its judgment. (See M. Kalcheim and I. Shapiro, *Transmutation and Commingling: The Supreme Court's Rebuttable Presumption Of Marital Property,* 71 Ill. B.J. 220 (1982).) Rather than rule on the issues ourselves, on the basis of a record which may be less than complete, we remand the case to the circuit court of Mercer County for determination of whether the presumption has been rebutted and, if not, for present valuation of the farm and for such distribution of it between the spouses as the court deems just.

### ROGER'S EQUITY IN CROPS

Roger seeks on cross-appeal to amend the circuit court's determination that his equity in crops in storage, admittedly marital property, was $19,000 at the time of dissolution. He claims that a proper calculation would show an equity of less than $10,000 based on 25,000 bushels of crops, a minimum saleable price of $2.50 per bushel, a debt of $51,250 still outstanding on the grain, and interest of six to seven percent which Roger also owed on the crop. These figures are in the record. Roger admits that the figure the circuit court adopted was copied from his own trial attorney's brief, which he now claims is erroneous.

While we would ordinarily treat this objection as waived by Roger's failure to bring it to the attention of the trial court (see, *e.g., Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141), we do not do so in this case. Sandra did not address the objection in her briefs or her oral argument before us, and although there is nothing to indicate that it was stipulated to, there is likewise no indication that it is disputed. As we are remanding the cause to the circuit court for disposition of questions concerning the Sackville

and McManus farms, we believe the fairest resolution of the issue of Roger's equity in crops in storage is to remand it to the circuit court for proper disposition.

ADEQUACY OF THE MARITAL PROPERTY DIVISION

Both parties appeal the trial court's award of 30% of the marital property to Sandra. Roger argues that in view of the size of the award, which includes child support payments of $50 per week and $151,250 as the cash value of Sandra's share of the marital property exclusive of the McManus farm, he would be forced to sell his nonmarital assets, including whatever is left of his farmland, and be left without a means of earning a living. He points out that Sandra has an income of at least $5,000 per year plus unreported additional earnings, and cites section 503(c) of the Act (Ill. Rev. Stat. 1977, ch. 40, par. 503(c)) and *In re Marriage of McCune* (1980), 86 Ill. App. 3d 311, 318, in support of his assertion that deprivation of livelihood is an important consideration in distributing marital property. Sandra argues that the award was not against the manifest weight of the evidence and suggests that it should have been increased to 50%, citing as authority *In re Marriage of Aschwanden* (1980), 82 Ill. 2d 31, in which we ruled an award of 22% insufficient.

We express no views as to the correctness of the distribution, other than to point out that in *Aschwanden* the husband's income and earning capacity were very much higher than the wife's. We believe that a decision on this issue would be premature until the circuit court rules on the disposition of the McManus farm, as we have directed it to do. We therefore instruct the circuit court of Mercer County to consider this issue as well on the remand. In view of the likelihood that the value of the Sackville and McManus farms has decreased since the original court order due to the general decline in farm prices which has taken place, we also instruct the court to make a current

valuation of these farms as a basis for this determination.

## SANDRA'S ATTORNEY FEES

Sandra finally contends that the trial court abused its discretion by failing to award her attorney fees, and that she should have received an award for attorney fees in view of the difficulty encountered in attempting to prove fraud by clear and convincing evidence. The circuit court denied attorney fees after finding that the award of marital property left Sandra with adequate financial resources. While Sandra argues that the illiquid nature of the marital assets renders it unlikely that she will receive her share of the marital property in cash for several years, we do not understand how an award of attorney fees will cause Roger to be any more able to make cash payments than he is currently under the trial court's order directing him to sell his nonmarital assets to satisfy the award of marital property. Sandra has not demonstrated that she is unable to pay her own attorney fees or that Roger is in any better financial position to do so than she is. (See *Donnelley v. Donnelley* (1980), 80 Ill. App. 3d 597, 599; *Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 581.) The allowance of attorney fees is within the sound discretion of the trial court, and its determination will not be overturned unless the trial court has clearly abused its discretion. (*Canady v. Canady* (1964), 30 Ill. 2d 440, 446; *Donnelley v. Donnelley* (1980), 80 Ill. App. 3d 597, 599.) We find no abuse of discretion here, and we affirm the trial court's denial of attorney fees.

## CONCLUSION

The judgment of the appellate court is reversed, and the order of the circuit court is affirmed as to the designation of the Sackville farm as marital property and as to the denial of attorney fees. The circuit court is reversed as to the McManus farm, and the cause is remanded to that

court for redetermination of the disposition of that farm and the overall amount of marital property to be awarded to Sandra, consistent with this opinion.

> *Appellate court reversed; circuit court affirmed in part and reversed in part; cause remanded, with directions.*

CHIEF JUSTICE RYAN concurring in part and dissenting in part:

I do not agree with the majority opinion's holding as to the Sackville farm. I think this opinion does violence to the holding of this court in *Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, and to the settled law in this State.

Although one may suspicion fraud on the facts of this case, there is no clear and convincing proof to support such a finding. The decisions Roger made to prefer payments on the combine, bins and the McManus farm over the Sackville farm proved to be sound business judgment because it permitted him to continue to farm the same acreage and to keep the equipment necessary with which to farm it. Had he made the payments on the Sackville farm and not on the equipment and the McManus farm, his acreage would have been reduced and he would have lost the equipment which he needed to continue farming.

After the forfeiture, Roger farmed the Sackville acreage on a sharecrop arrangement with his parents as he had done prior to entering into the contract for deed. Later, he leased the farm from his parents on a cash-rent basis. From his point of view, Roger's decision to make payments on farm equipment and the McManus farm, while allowing his contract for deed on the Sackville farm to be forfeited, was a reasonable business decision which allowed him to continue as a farmer. The evidence presented to the trial court supports this position.

A farmer must operate a certain amount of acreage in order to be able to farm profitably. In order to farm, one must make a substantial investment in machinery and

equipment. One cannot afford to make this investment if the acreage farmed is small. As the acreage farmed increases, generally speaking, the cost of farming, per acre, decreases. The 77½-acre McManus farm was not, by itself, large enough to achieve this economy of size. Furthermore, Roger had unsuccessfully sought to rent additional farmland. Roger's sacrifice of his "equity" in the Sackville farm, while retaining the right to operate that farm and retaining the McManus farm and his equipment as well, gave Roger the opportunity to continue as a farmer, which he could not have done if he had only the McManus acreage to farm.

The standard for judging whether a transaction is fraudulent is stated in *Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 358. In that case the court held that a transaction is a sham and tantamount to fraud when it is colorable or illusory. (*Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 358.) An illusory transfer is one which takes back all that it gives, and a colorable transfer is one which appears to be absolute on its face but which, because of a secret or tacit understanding between the transferor and transferee, is not an actual transfer because the parties intended ownership to be retained by the transferor. (*Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 359.) A transfer is a fraud on marital rights when the transferor in reality has no intent to convey any present interest in the property, but, in fact, intends to retain complete ownership. *Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 359. See also *Payne v. River Forest State Bank & Trust Co.* (1980), 81 Ill. App. 3d 1128; *In re Estate of Nemecek* (1980), 85 Ill. App. 3d 881.

While *Johnson* dealt with an *inter vivos* transfer of property in relation to the rights of a surviving spouse, the same test for validity of the transaction may be properly applied with respect to dissolution as well. (*O'Neill v. De-Laney* (1980), 92 Ill. App. 3d 292.) Additionally, the trans-

action must be shown to be fraudulent, *i.e.*, no actual transfer of ownership, by clear and convincing evidence. *Ray v. Winter* (1977), 67 Ill. 2d 296, 303; *Racine Fuel Co. v. Rawlins* (1941), 377 Ill. 375, 380.

In the instant case, while Roger may, in fact, have been happy to keep the Sackville property out of Sandra's reach, that is not the test. In *Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 357-58, this court stated:

> "In Illinois, however, and by the weight of authority in other jurisdictions, the owner of property has an absolute right to dispose of his property during his lifetime in any manner he sees fit, and he may do so even though the transfer is for the precise purpose of minimizing or defeating the statutory marital interests of the spouse in the property conveyed. [Citations.] Such a gift or transfer is not vulnerable or subject to attack by the surviving spouse unless the transaction is a sham and is 'colorable' or 'illusory' and is tantamount to a fraud. [Citation.]"

In *Johnson v. La Grange State Bank* this court also stated:

> "The intent to defraud is found in the nature of the transfer, whether it be illusory or colorable. In either event the transfer is a fraud on the marital rights because the transferor in reality had no intent to convey any present interest in the property but, in fact, intended to retain complete ownership. Although the spouse's marital rights can be defeated by an actual transfer, a purported transfer whereby the owner does not intend to convey a present interest, but intends to retain ownership, is evidence of an intent to defraud." (73 Ill. 2d 342, 359-60.)

The question to be decided is whether Roger, by virtue of an illusory or colorable transfer, retained an interest in the Sackville farm.

There is no evidence in the record that establishes that Roger has any more than a leasehold interest in the Sackville farm. Furthermore, there is no evidence that the forfeiture was a mere afterthought created solely to defraud Sandra. The written contract for deed contained the for-

feiture clause when it was drawn up. It was not a surprise to anyone. Sandra herself testified that she knew they were having financial difficulties and that Roger could not make the $5,000 payment on the Sackville farm before she filed her petition for dissolution.

The facts of the instant case contrast with those of *Draper v. Draper* (1873), 68 Ill. 17, which Sandra relies on for support and which the majority opinion likens to this case. In *Draper*, after the wife had filed suit for divorce, the husband threatened to dispose of the property so that the wife would get nothing. His threat was followed by a sale of property to his brother for *grossly inadequate consideration*. There had been no previous offer to sell before the filing for divorce.

The evidence in this case also clearly differs from that of *Sax v. Sax* (5th Cir. 1961), 294 F.2d 133, another case upon which Sandra relies. In that case the husband concealed from the wife the fact that he was receiving a substantial income from a trust. After the wife had filed for separate maintenance but before a support settlement decree was completed, the husband secretly had a supplemental trust agreement executed which placed the property beyond the wife's reach. The husband, however, still received the benefit of the trust.

Finally, the facts of the instant case also contrast with those of *Fong Hong May v. Fong Wan* (1959), 166 Cal. App. 2d 706, 333 P.2d 797, also relied on by Sandra. In that case, the husband was in partnership with his sons. The partnership was dissolved while the divorce was pending, and the husband transferred substantial property to the sons. However, the transfer was made pursuant to an oral agreement that, after the divorce was over, the property would be returned to the husband or to the partnership. In that case, the court found the transfer to be fraudulent.

In the instant case, there is no evidence that after the

forfeiture Roger Hofmann had any interest other than a leasehold interest in the Sackville farm. The facts of this case do not clearly and convincingly support the conclusion that the transfer was illusory or colorable. I believe that the appellate court was correct in holding that a valid forfeiture of the Sackville farm had taken place prior to the dissolution of the marriage. I, therefore, dissent as to the majority opinion's holding as to the Sackville farm.

I concur in the remainder of the majority opinion. However, I wish to state my understanding of the last paragraph. In making the new computations, the court should take into consideration the value of the farmland at the time of the hearing on remand and not the value of the farmland as found in the original decree. The price of farmland, generally, now is from one-third to one-half less than it was at the time of the original decree.