*In re* MARRIAGE OF ROBERT HENRY SCHMIDT, Petitioner-Appellant, and LYNN I. SCHMIDT, Respondent-Appellee.

Fourth District   No. 4—91—0948

Opinion filed February 18, 1993.—Rehearing denied April 19, 1993.

Stratton, Dobbs & Nardulli, of Springfield (Steven Nardulli, of counsel), for appellant.

Elizabeth W. Anderson, of Morse, Giganti & Appleton, of Springfield (Thomas R. Appleton, of counsel), for appellee.

Donald LoBue, of Springfield, guardian *ad litem*.

JUSTICE COOK delivered the opinion of the court:

Robert Henry Schmidt (Robert) appeals a judgment of the circuit court of Sangamon County dissolving his marriage to Lynn I. Schmidt (Lynn). On appeal, Robert argues (1) the trial court's distribution of assets was against the manifest weight of the evidence, (2) the trial court erred in ordering him to pay a portion of Lynn's attorney fees, (3) the trial court should have found dissipation and directed Lynn to reimburse the marital estate for the cash assets she had in her possession at the time of the separation, (4) the trial court erred in its order altering the visitation that existed during the separation, and (5) the trial court erred in ordering him to pay medical expenses incurred by Lynn during the separation. We affirm and remand.

Robert and Lynn were married July 8, 1978, in Menard County, Illinois. A child, Lauren, was born to them September 10, 1980. The parties separated September 19, 1986. Robert filed a petition to dissolve the marriage and Lynn filed a counterpetition. Robert's petition was later dismissed and the parties proceeded on Lynn's counterpetition. A judgment of dissolution of marriage was entered September 26, 1991.

Robert runs the day-to-day operation of his father's roofing and sheet metal business, Schmidt Brothers Roofing. According to Robert, he makes approximately $600 per week or $31,200 per year. From 1980 through 1985 (the years before the separation), Robert made $56,500, $56,000, $56,000, $61,000, $61,925, and $69,581 per year, respectively, or an average of $60,186 per year. From 1986 through 1991 (the years after the separation), Robert made $36,800, $31,200, $31,200, $31,200, $31,800 per year, respectively, or an average of $32,440 per year. Robert claims that much of his income in the early 1980's came from bonuses but, because the roofing business has taken a downturn, he had not received a bonus since 1985. Lynn works as a real estate salesperson for John B. Clark, Realtor, in Springfield. From 1987 through 1990, her income was $38,141, $38,789, $33,649, and $30,804 per year, respectively.

During the marriage, the parties lived in a home that Lynn had purchased with her prior husband. It had been awarded to her in the dissolution of that marriage, subject to the payment of $5,400 to the former husband as his share of the real estate. Robert paid Lynn's former husband $1,300 in partial payment, and the balance came from forgiveness of past-due child support and maintenance. Title was transferred to Robert and Lynn in joint tenancy. Lynn estimated that at the time of her marriage to Robert the house was worth between $76,000 and $79,000. At that time, Robert and Lynn obtained a new mortgage of approximately $50,500.

During the marriage Robert and Lynn embarked on an extensive and costly remodeling of the house. Lynn claimed the project got out of control and that Robert "ran the show." Over a period of eight years the parties wrote checks to different suppliers in an amount exceeding $132,000. Included in that amount was $11,767.55 paid to Schmidt Brothers for roofing work. Robert also claims that between 1978 and 1981 the parties ran $41,984.99 through the books of Schmidt Brothers for subcontractors and materials for the house, which was paid by the execution of a promissory note dated November 21, 1986, from Robert to Schmidt Brothers. Robert claims the total of the amounts expended on the house for remodeling was $185,752.54. Lynn argues that much of the money filtered through Schmidt Brothers was not spent on home improvement but on other items, such as the payment of Robert's parking tickets, car insurance, camera purchases, and for other, unknown purposes. Lynn testified that although the account had apparently been opened in 1979, she was not made aware of it until after the account had a balance due of over $41,000 which, according to the ledger sheet, was in 1982.

Robert claims that the remodeling was generally financed with money that came from his parents, as well as money he had prior to the marriage. At the time of the marriage, Robert had cash in checking and savings accounts in excess of $31,000, all of which he claims to have put into the remodeling of the house. Lynn contends that part of the remodeling was financed with money she had prior to the marriage and with money from their second mortgage on the house. At the time of the trial two mortgages existed against the real estate, one for $28,356 and one for $8,200, for a total mortgage indebtedness of $36,556. Robert had the house appraised at $157,000, and Lynn had the house appraised at $173,000.

Between the date of the marriage and the separation, Robert's parents made $38,600 in gifts to Robert and Lynn on special occasions such as birthdays, anniversaries and holidays. In addition to

those gifts, Robert's parents allegedly loaned substantial sums of money to Robert and Lynn. These alleged loans may be placed into two categories. The first is a category where notes were obtained at the time of the transfers; the second is a category where no notes were obtained until after the parties' separation. The first category amounted to a total of $35,000, plus $22,284.99 of interest as of the trial. The second category amounted to a total of $30,500, plus $9,290.71 of accumulated interest on previous loans (as mentioned within the note) and $10,555.56 of accumulated interest from the time of the note's execution through trial.

The first category of transfers is comprised of seven notes, each for $5,000, bearing a 6% interest rate, and signed by Robert and Lynn. Lynn testified to signing one of the notes while "holding a baby in one hand and frying chicken in the other." She said that Robert told her the documents were to memorialize the fact that his parents were giving more money to them than to Robert's brother and his wife. Lynn further testified that there was no intent to repay Robert's parents and that no interest rate was filled in on the documents at the time she signed them.

As to the second category of transfers, Robert contends that he and Lynn frequently approached his parents for additional money. Lynn testified, however, that she could not remember a single instance when Robert asked his parents for money in her presence. Robert's parents transferred, by checks made out to Robert and dated before 1985, an additional $30,500 to Robert and Lynn. Robert's father testified that he prepared a note regarding these transfers and had it signed by Robert after the separation. The amounts of these loans, unlike those in the first category, varied from $1,000 to $5,000 each.

At the time of the separation, Robert and Lynn had just over $4,500 in their joint checking account, of which Lynn removed $4,500. During the separation Robert borrowed over $45,000 from Magna Bank. Robert contends this money was spent on attorney fees, State and Federal taxes, interest on his accumulating debt, insurance on the home, real estate taxes, and a child therapist for Lauren. Robert also accumulated retirement funds totaling approximately $47,000, of which he contends $26,410 is marital property.

The trial court did not differentiate marital from nonmarital property or specify any values for the marital assets in its memorandum opinion and the subsequent judgment order. The court did not specifically address whether the transfers of monies from Robert's parents were gifts or loans, but assigned responsibility for the notes and loans

payable to Schmidt Brothers and to Velma and Ed Schmidt to Robert. Robert made no request that the trial court specifically identify or value marital property or explain whether the transfers were loans or gifts. The court awarded each party the things in his or her possession, apart from specific items and half the photographs, which were awarded to Lynn. The court ordered the house be sold and the net proceeds divided, and provided alternatively that if Robert wanted to purchase the house, he could buy Lynn's share for $65,000. The court did not compute the net marital estate. The court order did not require payment of maintenance to either party and awarded permanent custody of Lauren to Lynn with visitation rights to Robert. Robert was ordered to pay $425 per month to Lynn for child support and he was also ordered to keep and maintain a policy of medical insurance covering Lauren. Based upon Lynn's request that she be awarded attorney fees, Robert was ordered to pay $12,500 of Lynn's $28,000 attorney fees. Robert filed a post-trial motion seeking reconsideration of the issues raised on appeal. The trial court denied the motion.

■ Initially, Robert contends the trial court erred in its distribution of assets in holding him individually responsible for the debts to his parents and Schmidt Brothers. A trial court's distribution of marital property should not be reversed absent a showing that the trial court abused its discretion, i.e., no reasonable person could adopt the trial court's position. (*In re Marriage of Kerber* (1991), 215 Ill. App. 3d 248, 254, 574 N.E.2d 830, 834; see also *In re Marriage of Wade* (1987), 158 Ill. App. 3d 255, 268, 511 N.E.2d 156, 165.) Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) provides that marital property shall be divided in "just proportions" considering all relevant factors. (Ill. Rev. Stat. 1989, ch. 40, par. 503(d); *Atkinson v. Atkinson* (1981), 87 Ill. 2d 174, 179, 429 N.E.2d 465, 467.) The touchstone of apportionment of marital property is whether the distribution is equitable in nature. (*Wade*, 158 Ill. App. 3d at 268, 511 N.E.2d at 165.) Mathematical equality is not required; "just proportions" does not mean equal amounts. (*Wade*, 158 Ill. App. 3d at 268, 511 N.E.2d at 165; *In re Marriage of Caldwell* (1984), 124 Ill. App. 3d 898, 901, 465 N.E.2d 523, 525.) There is no obligation on the part of the trial court to make specific findings as to the reasons for its award. (See *Caldwell*, 124 Ill. App. 3d at 901, 465 N.E.2d at 526; *In re Marriage of Durante* (1990), 201 Ill. App. 3d 376, 383, 559 N.E.2d 56, 61.) It is helpful, however, for a trial court to indicate to the parties in some fashion why it did what it did. That explanation may enable the parties to better accept the decision, and perhaps

forego any appeal. The discipline of explaining a decision may also help the trial court better understand what it is doing, and correct any misimpressions it may have. The best orders list, at least generally, the items of marital property awarded each party, assign a value to each item, show the dollar amount of each lien or other debt to be paid by the parties, and total the columns to show what each party has been awarded.

The central property division concern in this case is the role the claimed "loans" from Robert's parents should play in the distribution of the marital estate. If the monies from the Schmidt family and from Schmidt Brothers were gifts, then the distribution of the marital estate was essentially equal and Robert concedes that he would have no quarrel. On that basis the marital estate, according to Robert's posttrial motion, is as follows:

| Assets | VALUE | LYNN | ROBERT |
|---|---|---|---|
| Real Estate | $166,556 | $ 83,278 | $ 83,278 |
| Individual Retirement Account (IRA)/Simplified Employee Pension (SEP) | 11,844 | | 11,844 |
| Merrill Lynch IRA | 6,216 | | 6,216 |
| Merrill Lynch IRA | 5,390 | | 5,390 |
| Shearson SEP | 2,960 | | 2,960 |
| Robert's household | 2,612 | | 2,612 |
| Lynn's household | 2,180 | 2,180 | |
| Lynn's jewelry | 6,731 | | 6,731 |
| Lynn's Cadillac | 13,000 | 13,000 | |
| TOTAL | $217,489 | $105,189 | $112,300 |
| | | | |
| Liabilities | | | |
| Mortgage | $ 28,356 | $ 14,178 | $ 14,178 |
| Promissory Note | 8,200 | 4,100 | 4,100 |
| Robert's Visa | 1,675 | | 1,675 |
| Robert's Mastercard | 1,282 | | 1,282 |
| Cadillac Note | 9,622 | 9,622 | |
| Lynn's credit card | 5,032 | 5,032 | |
| TOTAL | $ 54,167 | $ 32,932 | $ 21,235 |
| NET MARITAL ESTATE | $163,322 | $ 72,257 | $ 91,065 |

■ Robert contends that if, however, the notes were *bona fide* debts, or if the loans were an advancement against his inheritance, then the distribution of the marital estate would be grossly disproportionate. Robert argues the only significant difference between the parties is that he may someday inherit a substantial sum of money from his parents. Potential inheritances are not property which can be valued and awarded to a spouse, although they can be given some consideration in determining property distribution. (*In re Marriage of Eddy* (1991), 210 Ill. App. 3d 450, 460, 569 N.E.2d 174, 181; *In re Marriage of Benz* (1988), 165 Ill. App. 3d 273, 287, 518 N.E.2d 1316, 1324.) An advancement, of course, is more than a potential inheritance. It is an immediate gift and can be taken into account, in the division of marital property, as either marital or nonmarital property, whichever it happens to be.

■ A valid gift requires proof of donative intent and delivery of subject matter. (*In re Marriage of Brown* (1982), 110 Ill. App. 3d 782, 784, 443 N.E.2d 11, 13.) Donative intent is presumed if the transfer was from a parent to child. (*Brown*, 110 Ill. App. 3d at 784, 443 N.E.2d at 13.) There is a conflicting presumption, under section 503(b) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 503(b)), that property acquired after the marriage is marital. When conflicting presumptions are presented, they cancel each other out and the trial court is free to resolve the issue of whether the property acquired by the transaction was marital or nonmarital on the facts. (*In re Marriage of Rosen* (1984), 126 Ill. App. 3d 766, 772, 467 N.E.2d 962, 966; *In re Marriage of Agazim* (1986), 147 Ill. App. 3d 646, 648, 498 N.E.2d 742, 744; *In re Estate of Harms* (1992), 236 Ill. App. 3d 630, 639-40, 603 N.E.2d 37, 44.) The presumptions developed over the years to resolve disputes between donor and donee do not ordinarily work well in dissolution of marriage cases, where the donor and donee may not be the adversaries.

■ Trial courts are rightly skeptical of transfers by the parents of one of the litigants in a dissolution case. There is an incentive for both sides of the transfer, the parents making it and the litigant receiving it, to conform their testimony to the disadvantage of the other litigant. Transfers where the parents would never have sought repayment, if the marriage had remained intact, may be viewed from a different perspective when the marriage falls apart. (See *In re Marriage of Jacks* (1990), 200 Ill. App. 3d 112, 119, 558 N.E.2d 106, 111; *In re Marriage of Gable* (1990), 205 Ill. App. 3d 696, 700, 563 N.E.2d 1215, 1218.) If such a transfer were a gift it could be a gift to the marriage, thereby resulting in marital property, or it could be a gift to only one

of the litigants, thereby resulting in nonmarital property. If the funds transferred no longer exist it may be to the advantage of a litigant to treat them as a marital debt, payable from the marital assets, and probably reducing the possible award to the other litigant. (*In re Marriage of Douglas* (1990), 195 Ill. App. 3d 1053, 1059, 552 N.E.2d 1346, 1350 (debt must be distributed equitably, the same as marital assets); *In re Marriage of Smith* (1984), 122 Ill. App. 3d 213, 216, 460 N.E.2d 1201, 1204 (farm debts and assets should remain in one person).) A trial court which decides a transfer from parents to a litigant is a gift does not completely resolve the issue; the parents, unless they are made parties to the dissolution action (*In re Marriage of Pahlke* (1983), 120 Ill. App. 3d 1009, 1015, 458 N.E.2d 1141, 1146 (purchaser of marital residence named party defendant); *Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 214, 446 N.E.2d 499, 501 (parents added as parties defendant); *In re Marriage of Verdung* (1989), 126 Ill. 2d 542, 552, 535 N.E.2d 818, 822 (jurisdiction over second wife/joint tenant because of her participation)), are not bound by the judgment of dissolution and can seek to enforce what they still assert to be a loan against the party ordered to pay it, or even against the other party. Trial courts in dissolution cases often order litigants to pay alleged debts to their parents, even when the trial court has doubts whether a debt truly exists. *Jacks*, 200 Ill. App. 3d at 119, 558 N.E.2d at 111; *Gable*, 205 Ill. App. 3d at 700, 563 N.E.2d at 1218.

While it is impossible to tell, from the trial court's order, whether it considered the parental transfers to be loans or gifts, there was sufficient evidence from which the trial court could have determined that the bulk of the transfers were gifts to the marriage, and the trial court's decision may be affirmed on that basis. Certainly the $38,600 of gifts made on special occasions during the marriage were just that—gifts—and the trial court would have been justified in finding that the gifts were to the marriage, not to Robert individually. Likewise the $30,500 of notes (with $19,846.27 of interest) which were not signed contemporaneously with the transfers, but signed only by Robert after the parties' separation, was suspicious; a finding that the transfers were in fact gifts, and gifts to the marriage, would not be contrary to the manifest weight of the evidence.

The best argument that the parents made loans and not gifts to the parties involves the $35,000 (plus $22,284.99 interest) for which notes were signed at the time the transfers were made. Even with those notes, however, there was evidence upon which the court could have based a finding that what appeared to be loans were actually gifts to the marriage. Lynn testified the notes were never intended to

be repaid, and set out no interest rate at the time she signed them. There was no evidence of any payments ever being made on the notes, either of interest or principal. Robert's argument these notes were advancements is inconsistent with the idea that the notes had to be repaid. The trial court could have found the reason for executing the notes was to provide a record to be used in settling the estates of Robert's parents, so that the gifts made to Robert and his siblings by their parents, both *inter vivos* and by succession, would be equal.

■ The fact the trial court ordered Robert to "be responsible for all notes and loans payable to Schmidt Brothers, Inc.," or to his parents individually is not inconsistent with the trial court's viewing these transfers as gifts. As explained above, treatment of the transfers as gifts in the dissolution of marriage action did not settle the matter between the parents and Robert, or for that matter, between the parents and Lynn. Finally, even were we to view the contemporaneous notes as a true debt of the marriage, we could not say that the trial court abused its discretion in requiring Robert to pay that full amount. Without considering any debts to Robert's parents, the trial court awarded Robert about $19,000 more than was awarded Lynn. The $19,000 could reasonably have been viewed by the trial court as sufficient to compensate Robert for the questionable debt he was required to be responsible for.

The trial court may have taken into account the fact that in the years prior to the separation, Robert's total compensation, including bonuses, averaged $60,168 per year. In the year of, and years following, the separation Robert's total compensation averaged $32,440 per year. The trial court may have viewed the reduction in Robert's salary as a manipulation of Robert's marital estate and, consequently, required him to be responsible for any debts to his parents and the company that his father owned and he ran. It is clear from the record the trial court intended that Robert be responsible for all debts to his parents, including those evidenced by notes, and for notes to Schmidt Brothers. That intent was not expressed in the final judgment, however, and we remand so that the trial court may modify its judgment accordingly.

■ Robert alternatively argues that if the trial court were correct in effectively removing the debt to the Schmidt family and to Schmidt Brothers from the marital estate, some recognition should be given the fact that the source of the "equity" in the house was gifts to him individually. However, even if the transfers were considered to be nonmarital property, *i.e.*, gifts to Robert individually and not to the marriage, the funds lost their identity when they were invested in the

house. That commingling resulted in a transmutation of the funds into the classification of the estate receiving the contribution (the house), which was marital property. (Ill. Rev. Stat. 1991, ch. 40, par. 503(c)(1).) Robert might have been entitled to reimbursement from the marital estate, if he (1) established he did not make a gift to the marital estate, and (2) retraced the contribution by clear and convincing evidence. (Ill. Rev. Stat. 1991, ch. 40, par. 503(c)(2).) Robert did not establish a right to reimbursement in this case.

■ Next, Robert contends the trial court erred when it directed him to pay $12,500 of Lynn's $28,000 attorney fees incurred in the dissolution proceedings. Robert contends that in light of the distribution of the marital assets, the relative earnings of the parties, and the debt he incurred with his previous attorney, the direction that he pay a portion of Lynn's attorney fees was an abuse of discretion. Lynn argues that she is not able to incur more of these fees, and that Robert has paid most of his attorney fees and has had no difficulty obtaining money to do so.

The trial court in dissolution cases has the authority, after considering the financial resources of the parties, to order either spouse to pay a reasonable amount of the costs and attorney fees incurred by the other spouse. (Ill. Rev. Stat. 1989, ch. 40, par. 508.) The awarding of attorney fees and the proportion to be paid are within the sound discretion of the trial court and will not be disturbed on appeal, absent an abuse of discretion. *In re Marriage of Bussey* (1985), 108 Ill. 2d 286, 299, 483 N.E.2d 1229, 1235.

The propriety of an award of attorney fees is dependent upon (1) a showing by the party seeking them of an inability to pay, and (2) a demonstration of the ability of the other to do so. (*Bussey*, 108 Ill. 2d at 299-300, 483 N.E.2d at 1235; *In re Marriage of Hensley* (1991), 210 Ill. App. 3d 1043, 1054, 569 N.E.2d 1097, 1103-04.) Additionally, a party who has been forced to resort to the judicial process to secure compliance with the terms of an order or judgment is entitled to his or her reasonable attorney fees even absent a showing of inability to pay. In light of the evidence before the circuit court regarding the parties' financial resources and responsibilities, we cannot say that the circuit court erred in directing Robert to pay $12,500 of Lynn's attorney fees.

Next, Robert contends that the trial court should have directed Lynn to reimburse the marital estate for the $4,500 she took from the parties' joint account at the time of the separation. Robert contends Lynn cashed in an IRA that she had acquired during the marriage and deposited the money from both the IRA and their joint account

into a personal account, giving her about $13,000 in cash. Robert argues that Lynn's acts of using the money for nonmarital purposes amounted to dissipation under section 503(d)(1) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 503(d)(1)).

The term "dissipation," as used in section 503(d)(1) of the Act, refers to the use of marital property for the sole benefit of a spouse for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown. (*In re Marriage of O'Neill* (1990), 138 Ill. 2d 487, 497, 563 N.E.2d 494, 498-99, quoting *In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881, 886, 507 N.E.2d 207, 210.) This court has held that a spouse charged with dissipation of marital funds has the burden of showing, by clear and specific evidence, how the funds were spent. If expenditures are not documented adequately by the person charged with dissipation, courts generally affirm a finding of dissipation. Furthermore, general and vague statements that funds were spent on marital expenses or to pay bills are inadequate to avoid a finding of dissipation. (*In re Marriage of Adams* (1989), 183 Ill. App. 3d 296, 301-02, 538 N.E.2d 1286, 1290.) Here, however, the trial court did not make a finding of dissipation, though Robert raised the issue in his post-trial motion.

Whether there was dissipation is a question for the trial court and its determination will not be set aside absent an abuse of discretion. (*Adams*, 183 Ill. App. 3d at 300, 538 N.E.2d at 1289.) Whether a given course of conduct constitutes dissipation depends upon the facts of a particular case. (*In re Marriage of Tietz* (1992), 238 Ill. App. 3d 965, 983; *In re Marriage of Seversen* (1992), 228 Ill. App. 3d 820, 824, 593 N.E.2d 747, 749; *Adams*, 183 Ill. App. 3d at 301, 538 N.E.2d at 1290.) When the funds are spent for legitimate family expenses and necessary and appropriate purposes, there is no dissipation. *Tietz*, 238 Ill. App. 3d at 983; *Hensley*, 210 Ill. App. 3d at 1053, 569 N.E.2d at 1103.

■ Lynn does not dispute the fact that at the time of the separation she placed approximately $13,000 into a personal account. She claims that much of the money was spent on support for Lauren, the parties' daughter, as she did not receive any child support for at least seven months after the separation. She further claims a portion was spent in securing housing for herself, Lauren, and her two sons from a previous marriage, while Robert remained in the marital residence. In light of Lynn's claims that she used the money to support Lauren and secure housing, on the facts here we cannot say that the trial court's failure to find dissipation was an abuse of discretion.

Robert next challenges the visitation order. A temporary order governing Lauren's custody during the separation was entered by the court and gave Lynn custody, granting Robert visitation every first, third, and fourth weekend of the month and on Wednesday evenings. During the summer Robert had every other week as visitation. During the trial court's *in camera* interview, Lauren indicated that she would prefer visitation with Robert every other weekend instead of the first, third, and fourth weekends of every month. Consequently, the trial court's order upon dissolution of the marriage gave Robert visitation alternate weekends during the school year and during the summer. It further provided that Robert would have visitation on Wednesday evenings until the following morning. During the summer months, the Wednesday visitation period would be switched to Thursday on the weekends when Robert had visitation and Lauren would remain with him from Thursday evening through the weekend. Robert would also have two uninterrupted two-week periods of visitation each summer, to be designated by Robert by May 1 of each year.

Robert contends that the two extended summer visitation periods, the dates of which he must designate in advance, are problematic. He argues summer is the busy time in the roofing business and his job does not lend itself to the lead time needed to prepare for the visit of his child. He claims that if a work emergency required him to cancel his visitation plans he would lose an extended summer visit. Lynn contends the visitation schedule reflects Lauren's desire to have every other weekend with her father as stated in her *in camera* interview with the trial court. Lynn also maintains that the court found that the every-other weekend visitation schedule, along with the two two-week periods in the summer, provided more continuity in the minor child's life.

■ Visitation should be designed to promote the best interests of the child. The trial court wisely concluded that a temporary order requiring the child to change residences every week during the summer would not promote stability in the child's life and should not be the permanent solution. Lauren will be better able to plan her summer if Robert chooses his two weeks by May 1, but visitation can never work if the parties are inflexible and uncooperative. We trust that will not be the case here. Matters of child custody and visitation rest largely in the broad discretion of the trial court, and its determinations with respect thereto will not be disturbed on appeal unless a manifest injustice has been done. (*Rodely v. Rodely* (1963), 28 Ill. 2d 347, 350, 192 N.E.2d 347, 349; *In re Marriage of Brophy* (1981), 96 Ill. App. 3d 1108, 1112, 421 N.E.2d 1308, 1311.) A trial court has broad discretion

in ordering visitation of children with their parents and such a determination should not be modified on review unless there is manifest injustice to a parent or child. (*In re Marriage of Rink* (1985), 136 Ill. App. 3d 252, 259, 483 N.E.2d 316, 321.) The circuit court had the relevant evidence before it to fashion visitation in the best interest of the child, including an *in camera* interview with her, and we will not presume to second-guess its visitation order. We find the visitation as ordered was within the discretion of the trial court and no error has been demonstrated.

Last, Robert claims that the trial court erred in ordering him to pay the medical expenses incurred by Lynn during the separation. The order granting temporary custody and other temporary relief did not mention medical insurance. Lynn contends it was understood between herself, Robert, and the court that Robert was to maintain medical insurance for Lynn and Lauren. Robert admitted at trial that he did maintain medical insurance for both Lynn and Lauren. However, he requested that the insurance company not pay any medical expenses to ensure that any bills would "come through" him. A letter, admitted into evidence at trial, from the insurance company to the Springfield Clinic, where Lauren had been treated for an illness, read, in pertinent part, as follows: "We have received expenses relating to the injury/illness incurred on July 07, 1990[,] for Lauren. In accordance with Robert's request, we will not be considering these expenses under your group health plan at this time."

At trial, Lynn introduced a series of exhibits indicating that the medical expenses incurred for herself and Lauren were $1,238. The trial court ordered Robert to reimburse Lynn $1,238 for unpaid medical expenses. Robert claims he has no quarrel with paying Lauren's medical expenses but he should not have to pay Lynn's expenses. We conclude that the trial court did not abuse its discretion in ordering Robert to pay the medical expenses incurred by Lynn as well as Lauren during the separation, as it was in the best position to evaluate the responsibilities and the financial resources of the parties for such expenses.

For the reasons stated above, the judgment of the circuit court of Sangamon County is affirmed and remanded with directions for the circuit court to include in its order that Robert is responsible for any debts to his parents and Schmidt Brothers.

Affirmed and remanded with directions.

McCULLOUGH and KNECHT, JJ., concur.