Eli JURKOVICH, Appellant (Plaintiff),

v.

The ESTATE OF Emery TOMLINSON, deceased; Allyn Mae Tomlinson; and Eric A. Tomlinson, individually, and d/b/a Eric's Land and Cattle Company, a Wyoming partnership, jointly and severally, Appellees (Defendants).

No. 91-65.

Supreme Court of Wyoming.

Dec. 17, 1992.

* Chief Justice at time of oral argument.

Joel M. Vincent of Vincent & Vincent, Riverton, for appellant.

Robert B. Ranck and William P. Schwartz of Ranck & Schwartz, Jackson, for appellees.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ.

URBIGKIT, Justice.

The question we must answer here is what disposition should be made of a father's contention that he was bamboozled into investing in a money-losing farming operation owned by his newly acquired son-in-law and parents-in-law?

Appellant, Eli Jurkovich (Jurkovich), decided, in the days just preceding and following the marriage of his daughter, Mary Ann, to Eric A. Tomlinson, to invest money in a farm which was owned by Eric and his parents Emery and Allyn Mae Tomlinson (Tomlinsons). The farm was held by the Tomlinsons in a partnership known as Eric's Land & Cattle Company and, as the result of an agreement between Jurkovich and the Tomlinsons, Jurkovich acquired a one-half interest in the farm, with his son-in-law and daughter owning the other half. When the marriage, which had hurried along Jurkovich's decision to buy the farm, ended in failure, Jurkovich sought solace in a lawsuit against the Tomlinsons seeking damages for having been "defrauded" into buying an interest in the farm. The district court granted summary judgment in favor of the Tomlinsons on eleven counts constituting all claims alleged by Jurkovich except for a remaining prayer for accounting against Eric Tomlinson and a broad-based reciprocal counterclaim against Jurkovich. The appeal is presented on a W.R.C.P. 54(b), no just cause for delay, nunc pro tunc order. See Tader v. Tader, 737 P.2d 1065 n. 1 (Wyo.1987).

We hold that none of the issues raised in this matter are suitable for disposition upon motion for summary judgment and those issues must be presented for factual resolution at trial. We reverse and remand

for trial on all issues presented in the complaint and pretrial order totalling twelve counts and the counterclaim of four counts.

## I. ISSUES

Jurkovich presents this statement of the issues:

### A.

Did the district court err in adjudicating material facts in a summary judgment proceeding?

### B.

Did the district court err in determining there were no genuine issues of material fact in this case?

### C.

Did the district court err in granting summary judgment on claims of Jurkovich for fraud and intentional misrepresentation?

### D.

Did the district court err in granting summary judgment on the claim of Jurkovich for constructive fraud?

In response, the Tomlinsons contend, quite simply, that the only issue presented is the district court's determination that no genuine issues of material fact existed and the Tomlinsons were entitled to judgment as a matter of law.

## II. THE STORY

In his original complaint, Jurkovich set out the basic story, at least from his point of view.[1] Jurkovich resided in Eureka, California, and was the owner of a very substantial flooring business (assets near $700,000.00). The Tomlinsons all resided in Riverton, Wyoming. Emery Tomlinson was the moving force in the Tomlinson family and estimated his wealth at about $4,000,000.00 (although by the time of his

deposition, he may have lost much of that wealth).[2] On December 13, 1982, the Tomlinson's purchased a farm for a total purchase price of $448,000. The purchase was effectuated by a real property trade by Eric Tomlinson with the sellers at a documented stated value of $260,000, and, in addition, assumption by the Tomlinsons of a mortgage in favor of Travelers Insurance Company (Travelers) of $188,000. The Tomlinsons did not make any cash payment in the farm purchase. The Tomlinsons originally placed the farm in a partnership called Eric's Land & Cattle Company, with the Tomlinsons owning a one-half interest and Eric owning a one-half interest. This farm is the centerpiece of the legal tumult which now rages between Jurkovich and the Tomlinsons.

Jurkovich first met the Tomlinsons in early June of 1985 because his daughter was to marry Eric Tomlinson on July 7, 1985. That meeting took place at the farm and Jurkovich claims Emery Tomlinson, speaking on behalf of and with the knowledge of the Tomlinson family, offered to sell Jurkovich the fifty percent interest in the farm owned by the Tomlinsons with representation that the farm had a value of $475,000, although there was a mortgage balance remaining on the farm in favor of Travelers in the amount of $160,000 and a chattel mortgage on a windrower of $15,-000. Jurkovich also claims Emery Tomlinson told him the farm was making money and, if he would assume the obligations to Travelers and the windrower, Jurkovich would receive a one-half interest in the farm, i.e., for an investment of $175,000 he would receive a one-half interest in a farm worth $475,000. Jurkovich contends that he was led to believe, by Emery Tomlinson, that this was to be a very good deal.

Emery Tomlinson disputed many of these facts. He claimed Jurkovich initiated the discussion about buying an interest in the farm. Emery Tomlinson maintained he told Jurkovich he was going to sell the

---

1. See Jurkovich's affidavit in Appendix I attached to this opinion. This case is exhaustively pleaded with allegations of what the facts were.

2. Emery Tomlinson died during the course of this litigation, September 13, 1990, and his estate was substituted in the litigation.

farm because it was not making money and he was unwilling to put any more money into it. Emery Tomlinson claimed Jurkovich wanted to buy the farm as a "nice place" for his daughter and granddaughter to live and as a hedge against the dollar becoming worthless, as well as his apparent desire for a place where people could be self-sufficient.[3]

In significant part, Jurkovich's claims are based upon a hand-written note prepared by Emery Tomlinson during a meeting between the two men. That meeting took place under a tree on the farm—it was a beautiful summer's day when the farm was all abloom and the alfalfa was growing robustly. That handwritten note stated:

Perhaps the most divisive and economically significant issue in the claims of fraud and seller misconduct related to how and when buyer acquired knowledge of the balloon payment status of the Travelers mortgage, creating a due-in-full date of 1987. The original Travelers mortgage had been renegotiated in 1982–1983 for payment deferrals which resulted in both an interest rate increase and acceleration of the due date into a final ballooned payment due in 1987. Recorded documents existed from which this information could have been acquired. However, information concerning how this important financial factor was provided to Jurkovich is totally in evidentiary conflict within the summary judgment record. (See, however, the letter from Em-

---

**3.** Emery Tomlinson claimed Jurkovich often talked about a "doomsday" where it would be necessary to have a place to live where people could be self-sufficient. In furtherance of this goal, Emery Tomlinson asserted Jurkovich commanded that Eric and Mary Ann buy the right equipment, etc., and plant a garden where they could grow crops suitable for feeding human beings. As it was, the farm was devoted almost entirely to growing crops suitable for feeding cattle. A significant amount of the money (the $35,000 which is more fully discussed later in this opinion) Jurkovich forwarded to the Tom-

linsons as an initial payment on the farm was used for this purpose.

**4.** Two things can, without question, be determined from this record in regard to this circa July 7, 1985 handwritten note prepared by Emery Tomlinson. At the time the note was prepared, the May 1985 annual mortgage payment was unpaid and delinquent. Additionally, the $30,000 per year payment existed only for 1986 since the mortgage balance was ballooned to be due in full in 1987.

ery Tomlinson to Jurkovich of July 25, 1985 quoted hereafter in footnote five.) It is clear, without question, that as these negotiations were underway, Eric Tomlinson was in correspondence with Travelers

5. Jurkovich denied being informed of the balloon payment until after his initial payment on the deal and confirmation by letter dated July 25, 1985, written by Emery Tomlinson.

Without question, the prior owner had, in 1982 and 1983, entered into a modification agreement with Travelers to defer payments, apparently also by virtue of a financial squeeze, with the result of an interest rate increase and the substantial acceleration of the due date to 1987. Information regarding the modification is contained in three separate documents. At variant places in this very confused and disorganized record, copies of those documents are found which total eight in number reflecting no evidence of having been recorded and two with recording information which were first revealed to Jurkovich by attachment to an October 1, 1990 Defendants' Reply to Plaintiff's Traverse of Defendants' Motion for Summary Judgment. This is the first time anywhere in this record any copy of a recorded or unrecorded document showing the balloon payment modification is found, which is in a letter-sized agreement dated July 21, 1982 and entered into between the Tomlinsons' predecessor and Travelers. In this record, there is absolutely nothing to suggest that the Tomlinsons furnished documents or information to Jurkovich in advance of sale completion revealing that the Travelers' note included this two-year balloon payment requirement created as a price for the 1982 and 1983 payment deferrals. There is, however, a constructive notice issue created by the apparently undisclosed recording.

The significance of the status of the loan is demonstrated by three letters exchanged between Travelers and Eric Tomlinson in the period of June and July 1985 and the admission letter from Emery Tomlinson to Jurkovich of July 25, 1985:

Riverton, Wyoming
June 3, 1985
Mr. C.D. Haines, General Manager
The Travelers Insurance Companies
Real Estate Investment Department
7200 E. Orchard Road
PO Box 5980
Denver, CO 80217

Dear Mr. Haines;
This is regarding our telephone conversation of June 3, 1985.
We would like to request that the Principal in the amount of $15,000.00 be added on to the end of our loan agreement. Our loan number is 1993054. Also enclosed per your request is the interest payment of $15,810.00. [Ch # 1575]
Thank you for your courtesy in helping us out.

about a further deferment in payment, with the assertion that he did not have the money to make the payment. Actually, part of the Jurkovich original $35,000 was providently available to apply to make up the payment then past due in July 1985.[5]

Eric Tomlinson Land & Cattle
/s/
Eric Tomlinson
June 20, 1985

Eric Tomlinson
2159 West Bend Dr.
Riverton, Wyoming 82501

RE: Travelers Loan No.: 1993054

Dear Mr. Tomlinson:

As per you request to me in your letter dated June 3, 1985, Travelers is willing to extend the June 1, 1985 principal payment now due in the amount of $15,000.00 to maturity for the following considerations:
1) An increase in the contract rate from 10% to 10½% annual, effective with your next payment due and payable June 1, 1986.
2) An increase in the delay rate from 12% to 18%, also effective with your next payment due and payable June 1, 1986.
3) A $250.00 modification fee for the preparation of the necessary documents.
4) Travelers will also require an endorsement to our title policy maintaining a first position, and or a subordination of all junior creditors.
5) You will also be required to pay all costs and legal fees incurred by virtue of this modification.
If the above is agreeable to you, please return the signed original copy with your check for $250.00, made payable to The Travelers Insurance Company by July 1, 1985.

Riverton, Wyoming
July 24, 1985
Mr. C.D. Haines, General Manager
The Travelers Insurance Companies
Real Estate Investment Department
7200 E. Orchard Road
PO Box 5980
Denver, CO 80217

Dear Mr. Haines;
Enclosed please find my additional check of $15,000.00 to be applied on the principal of our loan # 1993054.
Sorry about the delay, but we were able to come up with the balance due on our payment, so we will not have to ask for the extention [sic]. In the future, I feel very confident that I will be able to keep the principal and interest paid on schedule.
Thank you!
Eric Tomlinson Land & Cattle
/s/
Eric Tomlinson

In addition to the initial purchase price, Emery Tomlinson claimed he had actually expended about $300,000 on the farm (in terms of payments, advances, improvements, etc.). However, at this stage the evidence is clouded as to whether this was "his money" or money from the farm earnings which was used to pay expenses and was less than the total expenses which he claims to have underwritten to the tune of over $50,000 during the first couple of years they owned the farm, i.e., there is a question whether Emery Tomlinson really spent only $50,000 of "his money" on the farm and if the remaining $250,000 was income of the farm used to pay expenses. Eric Tomlinson, of course, did "trade" his home and shop for the farm, although their "real" values at the time of the trade are not of record.[6]

Jurkovich asserted he reposed unusual trust and confidence in the Tomlinsons because of the impending marriage of their children, although he did call in his wife's sister and brother-in-law who were Colorado farmers and who, before the sale was executed, gave him their opinion the farm seemed to be worth $475,000. In consummating the sale, Jurkovich also utilized the services of an attorney and accountant, as did the Tomlinsons. While still in Riverton for the July 7, 1985 marriage, Jurkovich agreed to purchase a one-half interest in the farm by assuming the obligations to Travelers and for the windrower. On August 9, 1985, Jurkovich signed the last of the three assumption agreements which were used to effect the sale of the farm. The first assumption agreement was between Jurkovich and Eric's Land and Cattle Company; the second agreement provided that Jurkovich was purchasing a one-half interest in the farm from Emery and Allyn Mae Tomlinson as husband and wife; and the third was between Jurkovich and Eric Tomlinson. The Tomlinsons claim the agreement was modified twice to please Jurkovich and Jurkovich claims the modifications were at the behest of the Tomlinsons. Jurkovich claimed these agreements were pushed by the Tomlinsons because of pending litigation against them, that he was not informed of the impending litigation, and that it could have threatened his ownership interest in the farm. The Tomlinsons claim Jurkovich was the one who wanted the assumption agreements modified as a result of advice from his accountant and because he no longer wanted to agree that he would gift his interest in the farm to his daughter.[7] In consummation of the sale, deeds were signed, along with the other necessary documents, and, when the dust settled, Jurkovich and Eric Tomlinson owned the farm (lock, stock and barrel—all land, leases, equipment, improvements, etc.) as tenants in common.[8]

Jurkovich claims the Tomlinsons misrepresented the value of the farm, i.e., they knew it was worth far less than the amount they had allegedly put into it at the time they convinced Jurkovich to buy a one-half interest. The Tomlinsons knew this, he claimed, because they were fully

---

Riverton, Wyoming
July 25, 1985

Dear Eli & Pat,

Pat, you are absolutely right! The balance of the note is due June 1, 1987. It's been a long time since I did this and I didn't look at the papers before the attorney mailed them to you.

I will talk to Mr. Haines, General Manager of Travelers Insurance and request a continuous pay out based on the same terms as we are presently paying. I feel very confortable [sic] that this can be handled with them, but in the event it can't, I am sure we can make other arrangements locally at that time. Will keep you informed.

Enclosed is a copy of the original contract. Call me if you have questions.

Our best to you both!

Sincerely,

/s/
Emery Tomlinson

6. It could well be that the "trade" for the farm was not structured at all upon "real" values but was, rather, done for "tax avoidance" purposes.

7. By deed, Emery and Allyn Mae Tomlinson essentially gave their interest in the farm to their son Eric (thus, making a gift?). In the first two assumption agreements, it was stated that Jurkovich's commitment was to gift his interest to his daughter, but in the final agreement that language disappeared.

8. Although the Tomlinsons apparently assumed Jurkovich and their son wanted to operate the farm as a partnership, Jurkovich eventually disabused them of this thought and ensured, maybe for tax purposes, that the farm was owned by he and Eric as tenants in common.

aware of land values in Fremont County, Wyoming and because they had unsuccessfully tried to sell the farm. Further, Jurkovich contends they conspired to conceal from him the fact that the farm had never made money and that it had been, and would continue to be, necessary to put money into the operation.[9] Jurkovich also claims the Tomlinsons manipulated his first payment of $35,000 toward the farm (see footnote five), which he mailed to the Tomlinsons and which was to be applied to the Travelers mortgage, so as to recover interest they had paid Travelers for the year 1985 and to misappropriate some of those funds for purposes of operating the farm. Jurkovich maintains the Tomlinsons knew, or should have known, he would rely upon their representations because of the trust he had reposed in them as in-laws and because they knew he knew nothing about farming. Emery Tomlinson also claimed that neither he nor his son knew anything about farming, although they had operated the farm for about two and one-half years at the time the Jurkovich/Tomlinson deal was effectuated.

After the "sale" to Jurkovich was complete, he continued in participation by cash contribution to the farm operation until nearly the end of 1986 when he decided to stop.[10] Also, the marriage, then only a year and a half old, was traveling on rocky ground. Eventually, Jurkovich authorized the sale of the farm. The equipment was sold first for $70,000 (the total sale was $79,000, but Eric and Mary Ann claimed $9,000 of the sale as their own personal property). The land was put up for auction sale in which the highest bid was only $120,000, which could not be accepted since it was below the remaining mortgage balance on the Travelers mortgage. Because the Travelers mortgage was in default, a foreclosure sale was held and Travelers bought the farm for the amount of their note (about $145,000). Nobody received anything for the sale of the farm land. Eric and Mary Ann left for Oregon and eventually, in 1988, divorced. Thus, once the dust settled, Eric Tomlinson took $35,000 as his interest in the equipment sale and placed $35,000 in an account to be paid over to Jurkovich when directed to do so by a court. In essence, no one had much of anything, in terms of cash, as a memory of the farm.

## III. DISCUSSION

We must assay the allegations and evidence of the parties to determine if there exists the components required to be present before summary judgment is prudent. *Allmaras v. Mudge*, 820 P.2d 533 (Wyo. 1991). In this instance, after completing the six-stage analysis described in *Cordova v. Gosar*, 719 P.2d 625, 634–40 (Wyo.1986), we hold motion denial was required and trial disposition necessary.

Jurkovich sought relief based upon eleven causes of action which the district court summarized as follows:

[1] Count 1 alleges a conspiracy to fraudulently induce plaintiff to assume a mortgage.

[2] Count 2 alleges a material misrepresentation by Defendants as to the value of the property inducing the execution

---

9. The assumption agreements state that a part of Jurkovich's commitment was to underwrite the expenses of the farm, although he contends that was merely a mistake by his lawyer. The record clearly reveals that the farm operation was a heavy money loser in the years of 1983 and 1984 and apparently before the acquisition by the Tomlinsons and certainly after acquisition and before Jurkovich came on the scene. Additionally, the Tomlinsons had initiated sales efforts predating this transaction by listing the farm for sale at a price far below the $475,000 total which Jurkovich testified had been the purported value provided in discussions about his acquisition of the fifty percent interest.

10. The record is somewhat confusing, but the Tomlinsons recognized in their appellate brief that "Appellant paid the amounts owing to Traveler's for 1985 and 1986 (approximately $60,000.00), paid off the Borg–Warner obligation (approximately $15,000.00), and also advanced another $65,000.00 to Eric's Land and Cattle for operating expenses * * *." After all of these investments, the time came in late 1986 when Jurkovich had pulled the plug on his cash investment, after a total contribution of approximately $140,000, while the Travelers mortgage had been reduced only a fraction of that total by any applied portion of his investment contribution.

by Plaintiff of three assumption agreements.

[3] Count 3 alleges fraud as to values relating to the property.

[4] Count 4 alleges constructive fraud.

[5] Count 5 alleges bad faith in contractual and other dealings.

[6] Count 6 alleges outrageous conduct entitling Plaintiff to punitive damages.

[7] Count 7 alleges that a partnership was created in the relationship between the parties, entitling Plaintiff to dissolution, debts of the partnership being paid and an equalization of the capital accounts of the partners.

[8] Count 8 alleges a division of partnership profits and an accounting.

[9] Count 9 alleges a breach of fiduciary duty.

[10] Count 10 alleges bad faith on the part of the Defendants in their contractual relationship as a partner with Plaintiff.

[11] Count 11 alleges outrageous conduct on the part of the Defendants which entitle Plaintiff to punitive damages.

Jurkovich admitted he dealt only with Emery Tomlinson, although Eric may have been present at one of their meetings.[11] Jurkovich stated that he did have a conversation with Allyn Mae Tomlinson over dinner, but recited that he could not remember that conversation by stating, "It's hard to say what we talked about. Sex or * * *." So, as to the allegations of conspiracy, there is little or no evidence at this point, save for the fact that neither Allyn Mae or Eric came forward with any disclosures of

their own. Also, the books for the farm, which had been kept by Allyn Mae until the sale to Jurkovich, continued to be kept in offices controlled by the Tomlinsons, although Emery Tomlinson denied that any of the Tomlinsons ever "looked at them" after Eric and Mary Ann were married and assumed management control of the farm. Whether the issue is denominated as a "conspiracy" or as "an intent to defraud," makes very little difference at this stage of the proceeding. *See* Jerry Whitson, Note, *Civil Conspiracy: A Substantive Tort?*, 59 B.U.L.Rev. 921 (1979) and 16 Am.Jur.2d *Conspiracy*, § 49 (1979). A civil conspiracy, or "concerted action" tort, may be proven by circumstantial evidence such as that which has been alleged in this case. *See* 16 Am.Jur.2d, *supra*, at § 68 and *Britton v. Bill Anselmi Pontiac–Buick–GMC, Inc.*, 786 P.2d 855, 859–61 (Wyo.1990).

In summary, we have what is, perhaps, labeled in the law, of course with due regard for the feelings of the parties, a "testimony of contradiction" about nearly every fact and event. Jurkovich claims it was the Tomlinsons who proposed the whole deal. Emery Tomlinson claimed it was Jurkovich's idea. The Tomlinsons professed to have a certain "equity"[12] in the farm which made it appear to Jurkovich that his purchase of an interest in the farm was a "good deal." The Tomlinsons claim Jurkovich had no interest in a "good deal"; rather, he was interested in buying a legacy for his daughter and granddaughter, as well as a hedge against "doomsday." Jurkovich claims, although he does so with great inconsistency, that he did not know the farm was a business which required the

---

11. The record reveals that Emery Tomlinson conducted most of the business, at least some of it by signing the name of his son, pursuant to the provisions of an asserted general power of attorney. As this record develops, the son, Eric Tomlinson, appears to have been only a silent participant while all business transactions were conducted by his father, many in the signed name of his son.

12. "Equity" does have a fairly precise meaning in terms of real estate:

The remaining interest belonging to one who has pledged or mortgaged his property, or the surplus of value which may remain after the

property has been disposed of for the satisfaction of liens. The amount or value of a property above the total liens or charges.

Black's Law Dictionary 540 (6th ed. 1990).

Equity: 3b: the money value of a property or of an interest in a property in excess of claims or liens (as mortgaged indebtedness) against it c: a risk interest or ownership right in property; *specif*: EQUITY SECURITY

Equity security *also* equity * * *: a stock issue; *esp*: the common stock of a corporation

Webster's Third New International Dictionary 769 (1971).

constant input of capital. The Tomlinsons claim Jurkovich knew from the very beginning that the farm needed money in order to keep it running and that it would only be his assumption of the farm's debts which would allow the newlyweds to make a living from the farm.

Many questions are presented. Did the Tomlinsons know their farm was worth much less than the money they had purportedly put into it? If so, were they merely "puffing?" Did the Tomlinsons stand in a fiduciary relationship as to Jurkovich? Did they perceive Jurkovich as a convenient person to assume an indebtedness on a farm that had lost much of its value, or did the Tomlinsons merely expect as a fair quid pro quo that Jurkovich might feel an obligation to put as much money into the farm as the Tomlinsons had done in order to provide a healthy and happy environment in which their children and grandchildren could grow up? Did the Tomlinsons work in concert to "sell" Jurkovich on the idea of buying an interest in the farm? Given the circumstances of this case, might Jurkovich have honestly and justifiably believed that the Tomlinsons had the same interest in assisting to provide a farm home and family legacy for Eric and Mary Ann, or did they simply perceive Jurkovich's immediate "love affair" with the farm as an opportunity to unload a very bad investment that had the prospect of becoming a deficiency judgment rather than an "equity" in a piece of very fine Wyoming soil? Should Jurkovich have made a more thorough inquiry into the value of farmland in Fremont County, or was he justified in relying upon the Tomlinsons' representations? What was said or provided in addition to the handwritten note about the payout schedule for the Travelers mortgage or documents furnished which did or did not show the renegotiated 1987 balloon payment due date?

Jurkovich and Emery Tomlinson were, in many ways, men of similar characteristics. Both were apparently successful businessmen with substantial assets; both were represented by counsel; neither sought outside advice (legal or otherwise) immediately before entering into the agreement which is now in dispute; and both had children who had had unsuccessful marriages and were, apparently, incapable of making it in the world without parental financial support. The agreement was largely unstructured on both sides. Both parties appear to have "lost" considerable sums of money on the proposition: the Tomlinsons, because there was nothing left of the farm they purchased in 1982; and Jurkovich, because he invested in that farm at a time when the all-too-well-known and disastrous plunge in the value of Wyoming farm property was taking place. Both have lost because the marriage between their children ended in divorce and because the always tenuous relationship between the parents of married children ended in loyalty to their respective children rather than to the agreement which they may or may not have entered into with eyes open and business judgment in operating order.

How can a court of law sort this out on the basis of depositions and affidavits? So much is grounded in credibility. So much is built upon human understanding of such relationships. So much counts on the weighing of the evidence pro and con. *See generally Albrecht v. Zwaanshoek Holding En Financiering, B.V.,* 762 P.2d 1174 (Wyo.1988); *Rivermeadows, Inc. v. Zwaanshoek Holding En Financiering, B.V.,* 761 P.2d 662 (Wyo.1988); *Johnson v. Soulis,* 542 P.2d 867 (Wyo.1975); *Insurance Co. of North America v. Bath,* 726 F.Supp. 1247, 1254–55 (D.Wyo.1989); *Hofmann v. Hofmann,* 94 Ill.2d 205, 68 Ill.Dec. 593, 446 N.E.2d 499 (1983); 12 Samuel Williston, *A Treatise on the Law of Contracts,* ch. 45 (3rd ed. 1970); 15A C.J.S. *Confidential,* at 352–58 (1967); and 91 C.J.S. *Vendor and Purchaser,* §§ 54–71 (1955). If this recitation of authority appears general and lacking in focus, that is, quite simply, because the matters at issue have not yet been fixed or focused on by the rigors of trial— the only vehicle which can carry this controversy to its denouement. *Weaver v. Blue Cross–Blue Shield of Wyoming,* 609 P.2d 984 (Wyo.1980).

We do not find the dual requirements for granting summary judgment, "that there is

no genuine issue of a material fact and the [appellee] is entitled to judgment as a matter of law" to be demonstrated in this completely confused and factually conflicting record. *Stratman v. Admiral Beverage Corp.*, 760 P.2d 974, 978 (Wyo.1988).

## IV. CONCLUSION

Reversed and remanded for trial on all issues presented in the complaint, pretrial order and counterclaim.

## APPENDIX I

1. Your affiant is that individual named as Plaintiff in the above-entitled litigation;

2. Your affiant is currently, and has for approximately 30 years prior to the date of the execution by your affiant of this Affidavit, been engaged primarily in the flooring industry;

3. Other than your affiant's interest in the farm in question in this litigation, all other property in which your affiant has held an interest for approximately 30 years prior to the filing of this Affidavit is located within the state of California;

4. Your affiant's educational background consists of a high school diploma and one year of college at Eastern Montana College in Billings, Montana;

5. Your affiant has never engaged in farming as his livelihood at any time during your affiant's adult life;

6. Your affiant, prior to his dealings with the Defendants, had never considered nor acquired an ownership interest in agricultural real estate in California or any other state;

7. Your affiant, sometime in the early spring of 1985, was informed by his daughter, Mary Ann Slater, that she had met a fellow by the name of Eric A. Tomlinson;

8. Your affiant was further informed by his daughter, Mary Ann Slater, at a later time in the spring of 1985, that she was going [to] live with Eric A. Tomlinson at a farm that he and his parents owned north of Riverton, Wyoming;

9. As a result of your affiant's telephone conversation with his daughter, Mary Ann Slater, sometime in the spring of 1985 he traveled to Riverton, Wyoming, and met Eric A. Tomlinson, but did not at that time meet his parents, Emery Tomlinson and Allyn Mae Tomlinson, nor did he discuss with anyone the subject of the farm owned by the Tomlinsons;

10. On the second occasion that your affiant traveled to Riverton, Wyoming, in late May or early June of 1985, your affiant met Emery Tomlinson and Allyn Mae Tomlinson, the parents of Eric A. Tomlinson;

11. Upon the occasion of your affiant's introduction to Emery Tomlinson and Allyn Mae Tomlinson, Emery Tomlinson raised the subject of the farm owned by Emery Tomlinson, Allyn Mae Tomlinson and their son, Eric, and inquired if your affiant was interested in purchasing an interest in the farm;

12. To your affiant's memory, he informed Emery Tomlinson that he would think about [it]; however, at the time of the first meeting of your affiant with Emery Tomlinson and Allyn Mae Tomlinson, and at which time Emery Tomlinson inquired if your affiant would be interested in purchasing an interest in the farm, neither Emery Tomlinson, Allyn Mae Tomlinson or Eric A. Tomlinson made any representations concerning the value of the real estate or equipment comprising the farm, or what the equity in the farm might be;

13. Your affiant and his wife, Patricia Jurkovich, traveled to Riverton, Wyoming, in late June or early July of 1985, to attend the wedding of their daughter, Mary Ann Slater, and Eric A. Tomlinson, which took place on July 7, 1985, at the farm in question;

14. To your affiant's present recollection, two days prior to the wedding of Eric A. Tomlinson and Mary Ann Slater, your affiant met with Emery Tomlinson under a tree outside the home located on the farm in question;

15. Based upon your affiant's observation of the Tomlinson family and their relationship with each other, your affiant, by two days prior to the wedding of his daugh-

ter to Eric A. Tomlinson, had come to the conclusion and believed that Emery Tomlinson, when speaking with regard to the farm and any financial matter concerning his family, spoke with the whole family's consent and prior knowledge;

16. At the time your affiant and Emery Tomlinson sat and talked beneath the tree outside the main farm house on the farm in question, Emery Tomlinson wrote down on a piece of paper some information on the farm including placing in the left hand column the word "Equity" and beneath the same writing Emery—$200,000; Eric—$100,000; and Eli—$175,000, plus equipment which Emery Tomlinson did not value; a copy of said hand written note is attached hereto and incorporated herein as Exhibit "A" to this Affidavit;

17. During the course of the conversation in which Emery Tomlinson produced the hand written note, a copy of which is attached hereto as Exhibit "A", Emery Tomlinson represented to your affiant that $475,000 was the value of the farm; there was a promissory note and mortgage on the farm due to Travelers Insurance Company, in the then approximate principal balance of $160,000; and, that the same could be paid at the rate of $30,000 per year until the note was paid in full;

18. Emery Tomlinson further represented orally to your affiant, and in the hand written note, that there was a debt due and owing on equipment to Borg Warner in the approximate sum of $15,000;

19. Emery Tomlinson orally represented to your affiant, as well as setting forth the same in the hand written note, that if your affiant would assume the debts of the Travelers Insurance Company obligation and the Borg Warner obligation, your affiant would receive a one-half interest in the farm and equipment;

20. Your affiant understood and reasonably relied upon Emery Tomlinson's intentional misrepresentation made on his own behalf, his wife's behalf and his son's behalf, as memorialized in his hand written note, that the real estate portion of the farm was worth $475,000; Emery Tomlinson made such intentional misrepresentation on his own behalf, his wife's behalf and his son's behalf, and your affiant reasonably relied upon and understood the same as Emery Tomlinson intended him to understand the note, that the value of the farm was $475,000;

21. Your affiant agreed to assume the Travelers Insurance Company obligation and the Borg Warner obligation, based upon the intentional misrepresentations of Emery Tomlinson to your affiant both orally and in writing, in that your affiant reasonably believed, based upon his reasonable reliance as concerns the oral and written representations of Emery Tomlinson, that the real estate portion of the farm was worth $475,000; therefore, in return for your affiant assuming $175,000 in debt, your affiant would received one-half interest in the farm, which one-half interest would be worth $237,500, not including the value of your affiant's one-half interest in the equipment located upon the farm; Emery Tomlinson intended, as did his wife and his son, that such misrepresentations concerning the value of the farm would induce your affiant to agree to assume both the Travelers Insurance Company obligation and the Borg Warner obligation;

22. To your affiant's recollection, Emery Tomlinson raised the subject of the farm and your affiant purchasing an interest in the same by representing to your affiant that Eric A. Tomlinson and Mary Ann Slater could remain upon the farm; they would * * * lead a comfortable life upon the farm; and, if your affiant assumed the debts to Travelers Insurance Company and Borg Warner, they could then make a living from the operation of the farm;

23. Your affiant reposed great trust and confidence in Emery Tomlinson, Allyn Mae Tomlinson and Eric A. Tomlinson with regard to their representations, via Emery Tomlinson, concerning the value of the real estate, the amount and value of equipment comprising the farm, as well as the terms and conditions of the Travelers Insurance Company note and mortgage and the Borg Warner obligation, based upon the fact

that his daughter, Mary Ann Slater, would within two days of the date upon which the hand written note was presented to him would marry Eric A. Tomlinson;

24. Your affiant believed and, in good faith, reasonably relied upon the representations of the Defendants, made via Emery Tomlinson, and accorded those opinions all respect given the fact that his daughter was about to marry Eric A. Tomlinson and, therefore, your affiant could not envision at the time that his soon to be son-in-law and his in-laws would misrepresent to him the value of the farm, including the real estate and equipment; the terms and conditions of the primary obligation against the same, that being the Travelers Insurance Company note and mortgage;

25. Your affiant further reasonably relied upon the representations on Emery Tomlinson made in his hand written note and orally on behalf of himself, his wife and his son, that the Travelers obligation was payable in annual installments of $30,-000 per year, plus accrued interest at ten percent; your affiant, on July 19, 1985, transmitted a cashier's check made payable to Eric's Land and Cattle in the sum of $35,000; shortly after said transmission, your affiant and his wife, Patricia Jurkovich, discovered that the note and mortgage with Travelers Insurance Company provided for a balloon payment in the year 1987; your affiant's wife, Patricia Jurkovich, contacted Emery Tomlinson and confronted him with that information; your affiant felt bound to complete the transaction based upon agreeing to the same in principal with the Tomlinsons, as well as the fact that his daughter was now married to their son and because they already had $35,000 of his money; Emery Tomlinson, on July 24, 1987, transmitted a letter to your affiant and his wife wherein he admitted that he had failed to mention the balloon payment and also represented to them that he would aid them in obtaining either local financing or having Travelers Insurance Company [a]mend its note and mortgage such that the terms would comply with Emery Tomlinson in his handwritten note; neither Emery Tomlinson, his wife or his son ever made any efforts to aid your affiant in obtaining either modification of the note and mortgage or local financing approximating the terms and conditions represented by Emery Tomlinson both orally and in his hand written note;

26. Your affiant, through this litigation, has discovered that Emery Tomlinson, on June 3, 1985, and as result of your affiant not expressing an immediate interest in purchasing an interest in the farm, transmitted a letter to Travelers Insurance Company under the name of his son, Eric A. Tomlinson, and by writing his son's name on the letter, requesting that the Tomlinsons be allowed to pay only the accrued interest portion of the annual payment, that being approximately $15,810; and, further, that the principal portion of the note be placed at the back end of the note and mortgage; Emery Tomlinson made this request such that if Eli Jurkovich could not be fraudulently induced to assume the Travelers Insurance Company note and mortgage obligation, the Tomlinsons could then allow the same to be taken into default without having made the full annual payment; and, if in fact they could fraudulently induce your affiant to assume the obligation, that the $30,000 employed to pay the same would be your affiant's money;

27. On July 19, 1985, your affiant transmitted a cashier's check to Eric's Land and Cattle in the sum of $35,000;

28. Via discovery, your affiant has learned that the cashier's check for $35,000 was received by the Tomlinsons, approximately $15,800 of the same was paid to Emery Tomlinson and an additional $15,000 was paid to Travelers Insurance Company for the principal amount due on the 1985 annual payment; the Tomlinsons did not forward the additional $5,000 as your affiant desired for additional payment towards the note and mortgage obligation;

29. The payment to Emery Tomlinson and the failure to pay the additional $5,000 to Travelers Insurance Company was done without your affiant's knowledge or consent;

30. Your affiant has learned, via discovery, that Emery Tomlinson, by writing the signature of his son Eric A. Tomlinson, transmitted a letter to Travelers on the 24th day of July, 1985, stating that enclosed they would find the principal payment for the 1985 payment, and they envisioned no future difficulties in paying the note and mortgage as the same became due; the letter in question does not inform Travelers Insurance Company that the funds enclosed with the letter was [sic] received by the Tomlinsons from your affiant, nor that the Tomlinsons had agreed to convey a one-half interest in the real estate and equipment comprising of the farm to a third party, your affiant, in return for the third party, your affiant, assuming the Travelers Insurance Company note and mortgage;

31. Your affiant was not apprised by any of the Tomlinsons, at any time, about the transmission of the letter referred to in paragraph 30 of your affiant's Affidavit;

32. At the time Emery Tomlinson made the representations to your affiant in late June or early July, 1985, concerning the value of the farm on behalf of himself, his wife and his son, Emery Tomlinson did not disclose to your affiant that a farm information sheet was held by Fremont Realty, wherein the proposed sale price of $300,000, later reduced to $275,000, appears;

33. Your affiant was never informed by Emery Tomlinson, Allyn Mae Tomlinson or Eric A. Tomlinson of the fact that DeWayne Pfarr, on their behalf, transmitted a letter to Mr. Royer in Anchorage, Alaska, in March of 1985, offering to sell the farm to him for the sum of $300,000;

34. The three assumption agreements executed by your affiant were done so at the instance and request of the Tomlinsons; any changes as to the parties to the agreements, or the provisions in the agreements, were made at the direction of the Tomlinsons and not at the direction of your affiant;

35. Your affiant paid approximately $60,000 to Travelers Insurance Company on the note and mortgage; an additional approximate $15,000 to Borg Warner; and, in addition, your affiant transmitted, through 1985 and 1986, an additional $65,-000;

36. Your affiant advanced the additional sum of $65,000 to the Tomlinsons based upon their representation to your affiant that at the time crops were harvested and sold, that sum of the money from the proceeds of the sale, equal to that which your affiant by that point in time had advanced, would be transmitted to Travelers Insurance Company as advance payments on the note and mortgage;

37. Your affiant was never informed by any of the Tomlinsons of the fact that they listed the property for sale with Fremont Realty in February of 1986 for $300,000, later reducing the sale price to $275,000;

38. None of the Defendants ever informed your affiant of the fact that Emery Tomlinson and Allyn Mae Tomlinson insisted that their son, Eric A. Tomlinson, and your affiant's daughter, Mary Ann Slater, execute a security agreement in favor of them, based upon loans allegedly made by Emery Tomlinson and Allyn Mae Tomlinson to Eric A. Tomlinson prior to his marriage to Mary Ann Slater;

39. Your affiant was never aware of the existence of the security agreement, that the same was recorded and later released;

40. In August of 1986, the Tomlinsons represented to your affiant that they could sell the small home, with a small amount of acreage around the same, for $30,000 to Mr. and Mrs. Glen Rupert; your affiant agreed to said [sale], based upon his understanding that the net proceeds of the sale would be applied in their entirety to the Travelers Insurance Company note and mortgage; based upon your affiant's understanding he transmitted to Eric's Land and Cattle Company a check in the amount of $15,000 representing one-half of the proceeds of the sale of the property, in that the Tomlinsons owned a one-half interest in the farm; in fact, Travelers Insurance Company only insisted upon receiving approximately $11,000 and Eric A. Tomlinson expended the balance of the sale proceeds,

as well as the sum of $15,000 which your affiant transmitted to Eric's Land and Cattle;

41. Your affiant reasonably relied upon the representations Emery Tomlinson made both orally and in writing in the note, a copy of which is attached hereto as Exhibit "A", in that Emery Tomlinson was known by your affiant to be an "investor" and knowledgeable in the real estate business; and, further, your affiant placed a high degree of confidence in the representations Emery Tomlinson made orally and in writing on behalf of himself, his wife and his son, in that Eric A. Tomlinson, within two days after the date of said representations, was to marry your affiant's daughter, Mary Ann Slater[.]

CARDINE, Justice, dissenting.

I dissent. I would have affirmed the decision of the trial court.